IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CANDID CARE CO.,                          )
                                          )
                    Plaintiff,            )
                                          )   C.A. No. _____
         v.                               )
                                          )   **DEMAND FOR JURY TRIAL**
SMILEDIRECTCLUB, LLC,                     )
                                          )
                    Defendant.            )

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff Candid Care Co. ("Candid"), by and through its counsel, files this complaint against SmileDirectClub, LLC ("SDC" or "SmileDirectClub") for a declaratory judgment that claim preclusion and issue preclusion bar SDC from asserting infringement of U.S. Patent No. 10,861,599 ("the '599 patent") against Candid or, in the alternative, for a declaratory judgment that each claim of the '599 patent is invalid and/or not infringed.  The '599 patent is attached as Exhibit 1.

## INTRODUCTION

1.       This is an action for a declaratory judgment arising under the patent laws of the United States, Title 35 of the United States Code.  Candid seeks a declaratory judgment that claim preclusion and issue preclusion bar SDC from asserting infringement of the '599 patent against Candid.  In the alternative, Candid seeks a declaratory judgment that each claim of the '599 patent is invalid and/or not infringed.  The action arises from a real and immediate controversy between SDC and Candid as to whether Candid infringes any valid claim of the '599 patent.

2.       This is not the first lawsuit between SDC and Candid, and, as discussed below, not even the first lawsuit between these parties on patent claims directed to the same patent-ineligible subject matter.

3.      SDC filed its first lawsuit against Candid in the Supreme Court of the State of New York on April 5, 2018, asserting baseless claims of misappropriation of confidential and proprietary business information and trade secrets, unfair competition, aiding and abetting breach of fiduciary duty, and tortious interference with contract.  *See SmileDirectClub, LLC v. Candid Care Co.*, Index No. 651637/2018, Doc. No. 2 (Sup. Ct. of New York County) ("New York Lawsuit").  Candid moved to dismiss the complaint on May 9, 2018.  On September 7, 2018, the court granted Candid's motion to dismiss, stating that it had "rarely seen a more meritless claim." New York Lawsuit, Doc. No. 91 (attached as Exhibit 2) at 12:19-20; *see also id.* at 15:4-7 ("Your complaint is dismissed.  Thank you very much.  That's with prejudice too.  This case is just trying to put a competitor out of business.").  SDC did not appeal that decision.

4.      Two years later, on April 29, 2020, SDC filed a patent infringement lawsuit against Candid in this Court, asserting infringement of U.S. Patent No. 10,636,522 ("the '522 patent").  *See SmileDirectClub, LLC v. Candid Care Co.*, C.A. No. 20-583-CFC (D. Del.) ("First Delaware Lawsuit").  A copy of the '522 patent is attached as Exhibit 3.  On June 19, 2020, Candid moved to dismiss that complaint under Rule 12(b)(6) for failure to state a claim because the '522 patent claims are directed to the patent-ineligible abstract idea of teleorthodontics: providing dental aligners directly to the patient without the patient ever physically seeing a dentist or orthodontist. *See* First Delaware Lawsuit, D.I. 12, 13.

5.      SDC filed a motion for a preliminary injunction on October 27, 2020—six months after filing of the complaint and three months after briefing on Candid's motion to dismiss was complete.  *See* First Delaware Lawsuit, D.I. 22, 23.  The Court held a conference on November 4, 2020, during which it noted that the '522 patent "is by far, of all the patents I have come across, the one that strikes me as suspect.  I just find it really hard to understand how this

patent is an allowed patent." First Delaware Lawsuit, D.I. 29 at 10:10-13. On December 7, 2020, the Court granted Candid's motion to dismiss, finding each claim of the '522 patent invalid as directed to patent-ineligible subject matter. *See* First Delaware Lawsuit, D.I. 50, 51. A copy of that written decision is attached as Exhibit 4.

6. In the First Delaware Lawsuit, SDC relied on U.S. Patent Application No. 16/859,950 ("the '950 application") in support of its position that the claims of the '522 patent are not directed to patent-ineligible subject matter. *See* First Delaware Lawsuit, D.I. 21; *see also* D.I. 23 at 11-12. The '950 application issued as the '599 patent, which is the subject of the instant action. The '599 patent is a continuation of the '522 patent, and as described by SDC, "contains substantially similar claims to [the claims of the '522 patent]. … For instance, claim 20 of the '950 application [which issued as claim 16 of the '599 patent] and claim 1 of the '522 patent both claim the near identical methods for producing aligners." First Delaware Lawsuit, D.I. 23 at 11-12; *see also* D.I. 29 at 12:5-18 (SDC's counsel representing that the '522 patent claims are "very, very similar, if not identical," to the '599 patent claims). Indeed, a redline comparison of claims 1-10 of the '522 patent and claims 16-25 of the '599 patent, attached as Exhibit 5, demonstrates that the two sets of claims are nearly identical, with only superficial differences that are immaterial to the question of patent ineligibility under 35 U.S.C. § 101. Claims 1-15 of the '599 patent are also substantially the same as invalid claims of the '522 patent for all purposes germane to patent ineligibility under 35 U.S.C. § 101.

7. In the First Delaware Lawsuit, SDC expressly stated that it intended to pursue a claim for infringement of the '599 patent against Candid before this Court upon the patent's issuance. *See* First Delaware Lawsuit, D.I. 23 at 12 n.1. Candid thus anticipated defending against SDC's allegations of infringement of the '599 patent in this Court.

8.      The '599 patent issued on December 8, 2020.  That same day, SDC filed a lawsuit in the United States District Court for the Western District of Texas asserting infringement of the '599 patent against Candid for the same accused business practices that SDC had accused of infringing the '522 patent in the First Delaware Lawsuit, *i.e.*, Candid's Studio business model and workflow.  *See SmileDirectClub, LLC v. Candid Care Co.*, No. 6:20-cv-1115, D.I. 1 (W.D. Tex. Dec. 8, 2020) ("Texas Lawsuit").  A copy of that complaint is attached as Exhibit 6.

9.      SDC's Texas Lawsuit is a blatant forum-shopping attempt to avoid this Court and its holding that SDC's '522 patent claims are directed to patent-ineligible subject matter under 35 U.S.C. § 101.  It also was filed in anticipation of this declaratory judgment action.  Recognizing that asserting the '599 patent in this District would fail in view of this Court's holding in the First Delaware Lawsuit, SDC filed the Texas Lawsuit in an attempt to preempt Candid from filing of a declaratory judgment action in this Court on the '599 patent claims.  In the interests of justice and judicial efficiency, any dispute between SDC and Candid concerning the '599 patent should be adjudicated in this Court, which is where SDC chose to sue Candid for infringement of the '522 patent, and where SDC said it would pursue its infringement claim on the '599 patent.

10.     SDC's actions have created a real and immediate controversy between SDC and Candid as to whether Candid infringes any valid claim of the '599 patent.  The facts and allegations recited herein show that there is a real, immediate, and justiciable controversy concerning these issues.

## THE PARTIES

11.     Plaintiff Candid Care Co. is a Delaware corporation with its principal place of business in New York, New York.

12.     On information and belief, SDC is a Tennessee limited liability company with its principal place of business in Nashville, Tennessee.

13.     On information and belief, SDC owns the '599 patent and the '522 patent.

## JURISDICTION AND VENUE

14.     This action arises under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

15.     This Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. §§ 1331, 1338, 2201, and 2202.

16.     This Court can provide the declaratory relief sought in this complaint because an actual case and controversy exists between the parties within the scope of this Court's jurisdiction pursuant to 28 U.S.C. § 2201.  An actual case and controversy exists at least because SDC has accused Candid of infringing one or more claims of the '599 patent, which Candid denies.  Claim preclusion and issue preclusion bar SDC from pursuing its claim for infringement of the '599 patent.  Moreover, Candid does not infringe and has not infringed any valid claim of the '599 patent.

17.     SDC's actions thus have created a real, live, immediate, and justiciable case or controversy between SDC and Candid.

18.     SDC has established sufficient minimum contacts with this District such that SDC is subject to specific personal jurisdiction.  Further, the exercise of personal jurisdiction based on these pertinent contacts does not offend traditional notions of fairness and substantial justice.

19.     For example, this Court has personal jurisdiction over SDC because SDC has engaged in judicial patent enforcement against Candid in this District with respect to the

closely-related '522 patent—namely, the First Delaware Lawsuit.  Further supporting personal jurisdiction, SDC expressly stated that it intended to add the '599 patent to the First Delaware Lawsuit upon its issuance.

20.     Moreover, SDC has consciously and purposefully directed allegations of infringement of the '599 patent and related patents toward Candid, a company organized under the laws of Delaware.

21.     Venue is proper in this District under 28 U.S.C. § 1391 because venue in declaratory judgment actions relating to invalidity and noninfringement of patents is determined under the general venue statute 28 U.S.C. § 1391.

22.     Under 28 U.S.C. § 1391(b)(1), venue is proper in any judicial district where a defendant resides.  Under 28 U.S.C. § 1391(c)(2), an entity with the capacity to sue and be sued shall be deemed to reside in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question.  Accordingly, since SDC is subject to personal jurisdiction with respect to this action in this District, then, at least for purposes of this action, SDC resides in this District and venue is proper under 28 U.S.C. § 1391.

23.     Under 28 U.S.C. § 1391(b)(2), venue is proper in any judicial district in which a substantial part of the events giving rise to the claim occurred.  The First Delaware Lawsuit gives rise to the claim and issue preclusion claims in this case, in particular, SDC's filing of the First Delaware Lawsuit on substantially identical patent claims as the '599 patent and SDC's expressed intention to assert the '599 patent in this District.  Thus, venue is proper in this District for at least that additional reason.

## FACTUAL BACKGROUND

24.      SmileDirectClub, formerly named SmileCareClub, was founded in 2014. *See* Exhibit 6 at ¶ 15; *see also* Exhibit 9 ("SmileCareClub is Now SmileDirectClub," SmileDirectClub Blog Post (dated March 30, 2016)).  SDC provides teleorthodontic services by connecting patients with dental professionals for clear aligner therapy without the dental professional ever physically seeing the patient.  *See, e.g.*, First Delaware Lawsuit, D.I. 1 at ¶¶ 19-24.

25.      SDC's teleorthodontics business model includes the following steps, which SDC has practiced since before June 21, 2016 (one year before the earliest possible effective filing date of the '599 patent claims).

26.      First, the patient takes a smile assessment which allows a dental professional to determine if SDC's product offering is available to the patient.  *See, e.g.*, Exhibit 10 (SDC's "How It Works" webpage (archived March 17, 2015)); Exhibit 11 at 2 ("Product Profile: Invisible Aligners," Decisions in Dentistry (dated October 5, 2015)); Exhibit 12 at 4 (SDC's "Buyer's Guide" (available as of at least April 5, 2016)).

27.      Second, if the assessment indicates the patient is a candidate for treatment with SDC, an impression kit is sent to the patient's home.  The patient creates his/her dental impressions using the provided kit and mails them back to SDC where its lab will use the impressions to create a three-dimensional model of the patient's teeth.  *See, e.g.*, Exhibit 10; Exhibit 11 at 2; Exhibit 12 at 4.  Alternatively, instead of creating impressions with the at-home kit, a patient could schedule an appointment with a SmileTech or SmileGuide (a non-dentist technician) for an intraoral scan of the patient's mouth.  *See, e.g.*, Exhibit 11 at 2; Exhibit 12 at 4; Exhibit 13 at 33-34 ("SmileCareClub: Where are they now?," The Progressive Orthodontist

(Q1 2016)); Exhibit 14 ("What is the SmileCareClub Onsite Scan?," SDC Blog Post (dated Jan. 25, 2016)); Exhibit 15 ("Where can I find SmileCareClub locations?," SDC Blog Post (dated Feb. 23, 2016)); Exhibit 16 (SDC Twitter Reply Post dated May 27, 2016).  This intraoral scan could be at the patient's home, office, or other location, such as an SDC SmileShop.  *See id.*  These scans are conducted by technicians who are not dentists or orthodontists.  *See, e.g.*, Exhibit 13 at 33-34; Exhibit 14; Exhibit 15.  Prior to June 21, 2016, SDC was operating SmileShops in numerous locations, including, among others, New York, Washington, D.C., and Nashville, Tennessee.  *See, e.g.*, Exhibit 16.

28.     Third, a state-licensed, board-certified dentist or orthodontist will work with SDC to create the patient's personal treatment plan based on the three-dimensional data of the patient's mouth, obtained from either the impressions or the data from the intraoral scan.  *See, e.g.*, Exhibit 10; Exhibit 12 at 4-5; Exhibit 14; Exhibit 15; Exhibit 17 (SDC's "Custom Treatment Plans" webpage (archived April 18, 2015)).  This approval is given without the dentist or orthodontist having physically seen the patient.  *See, e.g.*, Exhibit 9 at 2; Exhibit 11 at 1-2; Exhibit 14; Exhibit 15; Exhibit 18 at 2-3 (SDC's "Frequent Questions" webpage (archived March 17, 2015)); Exhibit 19 (SDC Twitter Reply Post dated June 22, 2016).

29.     Fourth, after the dentist or orthodontist creates and approves the patient's customized treatment plan, the treatment plan is sent to the patient for approval.  At that time, the patient decides whether to purchase the aligners according to the plan and proceed with treatment. *See, e.g.*, Exhibit 11 at 2; Exhibit 12 at 4-5; Exhibit 17; Exhibit 18 at 2; *see also* Exhibit 20 (Screen captures of YouTube Video titled "SmileCareClub FOLLOWUP 3D Plan," published by Jamin Journeys (dated March 15, 2016)) and *available at* https://www.youtube.com/watch?v=pw1kAWqQv5I.

30.     Fifth, if the patient decides to proceed with the treatment, the dentist or orthodontist will prescribe the treatment plan and the aligners will be manufactured in accordance with the treatment plan.  *See, e.g.*, Exhibit 10; Exhibit 12 at 4-5.  The aligners are configured to move one or more of the patient's teeth according to the treatment plan.  *See, e.g.*, Exhibit 18 at 1.

31.     Sixth, once the aligners are manufactured, they are shipped directly to the patient.  *See, e.g.*, Exhibit 11 at 2; Exhibit 20 at 1.  The patient thus receives orthodontic treatment without ever having physically seen the dentist or orthodontist.  *See, e.g.*, Exhibit 11 at 2; Exhibit 12 at 3-4; Exhibit 18 at 2-3.

32.     Candid was founded in 2017.  Candid provides clear aligner treatment with remote monitoring by an orthodontist.

33.     On April 8, 2018, SDC filed a complaint in the Supreme Court of the State of New York, County of New York, asserting baseless claims against Candid for misappropriation of confidential and proprietary business information and trade secrets, unfair competition, aiding and abetting breach of fiduciary duty, and tortious interference with contract.  *See* New York Lawsuit, Doc. No. 2.  SDC moved for a temporary restraining order and preliminary injunction on May 8, 2018.  *See* New York Lawsuit, Doc. Nos. 19, 20.  Candid moved to dismiss the case on May 9, 2018.  *See* New York Lawsuit, Doc. Nos. 39, 40.  On June 14, 2018, the court denied SDC's motions for a temporary restraining order and preliminary injunction.  *See* New York Lawsuit, Doc. Nos. 71, 72.  On August 27, 2018, the court granted Candid's motion to dismiss, recognizing that it had "rarely seen a more meritless case."  New York Lawsuit, Doc. No. 91 (attached as Exhibit 2).

34.     On September 13, 2018, SDC filed U.S. Patent Application No. 16/130,762, which issued as the '522 patent on April 28, 2020.  The '522 patent purports to be a continuation-

in-part of U.S. Patent Application No. 15/725,430, filed on October 5, 2017, and claims priority to U.S. Provisional Application No. 62/660,141, filed on April 19, 2018, and U.S. Provisional Application No. 62/522,847, filed on June 21, 2017.  *See* Exhibit 3.

35.     On April 27, 2020, SDC filed U.S. Patent Application No. 16/859,950, which issued as the '599 patent on December 8, 2020.  *See* Exhibit 1.  The '599 patent purports to be a continuation of the '522 patent.  *See id.*

36.     On April 29, 2020, SmileDirectClub filed a complaint in this District asserting that Candid's Studio business model and workflow infringe claims of the '522 patent. *See* First Delaware Lawsuit, D.I. 1.  In its complaint, SDC asserted that the '522 patent claims are directed to, and cover, its SmileShop business concept.  *See, e.g.*, *id.* at ¶¶ 3-4, 14, 16, 19, 24, 25, 33.

37.     Candid moved to dismiss the complaint on June 19, 2020.  *See* First Delaware Lawsuit, D.I. 12, 13.  In particular, Candid demonstrated that each claim of the '522 patent is invalid for claiming the patent-ineligible abstract idea of teleorthodontics: providing dental aligners directly to the patient without the patient ever physically seeing a dentist or orthodontist.  *See* First Delaware Lawsuit, D.I. 13 at 1.  Candid further demonstrated that no claim includes an inventive concept that would transform the abstract idea into patent-eligible subject matter; instead, the claims implement the abstract idea using well-known systems and the off-the-shelf equipment such as an iTero® intraoral scanner.  *See id.* at 1, 13, 19-22.

38.     SDC filed a motion for preliminary injunction on October 27, 2020—six months after filing of the complaint and three months after briefing on Candid's motion to dismiss was complete.  *See* First Delaware Lawsuit, D.I. 22, 23.  In its supporting brief, SDC averred that

the '522 patent claims are "substantially similar" to the '599 patent claims and "claim the near identical methods for producing aligners":

> Relevant to this issue is the United States Patent and Trademark Office's ("USPTO") recent confirmation of the validity of the '522 patent as it relates to 35 U.S.C. § 101 vis-à-vis a related patent application.  The USPTO recently granted SDC's U.S. Application No. 16/859,950 ("the '950 application") [which issued as the '599 patent], a continuation of the '522 patent that contains substantially similar claims to those asserted here. … For instance, claim 20 of the '950 application [issued claim 16 of the '599 patent] and claim 1 of the '522 patent both claim the near identical methods for producing aligners.

First Delaware Lawsuit, D.I. 23 at 11-12 (citations and footnote omitted).  SDC also told the Court that it would be adding the '599 patent to the First Delaware Lawsuit.  *See id.* at 12 n.1.

39.    The Court held a conference on November 4, 2020, during which it commented that the '522 patent "is by far, of all the patents I have come across, the one that strikes me as suspect.  I just find it really hard to understand how this patent is an allowed patent."  First Delaware Lawsuit, D.I. 29 at 10:10-13.  At that conference, SDC again reiterated the substantial similarity between the claims of the '599 and '522 patents, stating the '522 patent claims are "very, very similar, if not identical," to the '599 patent claims.  *Id.* at 12:5-18.

40.    On December 7, 2020, the Court issued a written opinion finding each claim of the '522 patent invalid under 35 U.S.C. § 101 as directed to patent-ineligible subject matter.  *See* First Delaware Lawsuit, D.I. 50 (attached as Exhibit 4).  On that basis the Court granted Candid's motion to dismiss.  *See* First Delaware Lawsuit, D.I. 51.  In its written opinion, the Court agreed with Candid that the '522 patent claims "are directed to the abstract idea of 'teleorthodontics' and do not contain any inventive concept."  First Delaware Lawsuit, D.I. 50 at 9.  The Court found that the '522 patent claims a general workflow, *i.e.*, "claims systems and method by which a patient's intraoral scan is scheduled, performed, and used to create aligners and the

patient receives orthodontic treatment without ever interacting in person with a dentist or orthodontist," *id.* at 2, and that all of the '522 patent claims are substantially similar and recite permutations of the same workflow. *See id.* at 5, 9.

41.     The next day, on December 8, 2020, SDC filed a complaint in the United States District Court for the Western District of Texas, asserting infringement of "at least" claim 16 of the '599 patent. *See* Texas Lawsuit, D.I. 1 at ¶¶ 53, 58. The complaint does not identify any claims other than claim 16. *See generally id.*

42.     The Texas Lawsuit is the latest in a pattern of baseless lawsuits that SDC has filed against Candid. *See* New York Lawsuit, Doc. No. 91 at 12:19-20, 15:4-7 (court expressing that it had rarely seen a more meritless case, and dismissing the case); First Delaware Lawsuit, D.I. 50, 51 (this Court dismissing the case because the asserted '522 patent was ineligible for claiming an abstract idea and commenting that of all the patents it has come across, the '522 patent struck it as the most suspect and that the Court could not understand how it was an allowed patent); Texas Lawsuit, D.I. 1 (SmileDirectClub filing a lawsuit on a patent it has admitted is "very, very similar, if not identical" to the invalid '522 patent).

43.     The only reasonable inference for why SDC filed its infringement complaint on the '599 patent in the United States District Court for the Western District of Texas is because it hopes to avoid this District's adverse ruling on the admittedly "very, very similar, if not identical" patent claims of the '522 patent. Indeed, SDC is a Tennessee limited liability company with its principal place of business in Tennessee—not Texas (*see* Texas Lawsuit, D.I. 1 at ¶ 12)—and Candid is a Delaware corporation with its principal place of business in New York—again, not Texas.

## CLAIM FOR RELIEF
### (Declaratory Judgment that Claim Preclusion and Issue Preclusion Bar SDC From Asserting the '599 Patent against Candid)

44.     Candid repeats and realleges each and every allegation contained in paragraphs 1-43 as though fully set forth herein.

45.     SDC is precluded under the doctrines of claim preclusion and issue preclusion from asserting infringement of the '599 patent against Candid.

46.     Claim preclusion, also known as res judicata, applies because there was (1) a final judgment on the merits in the First Delaware Lawsuit involving (2) the same parties, SDC and Candid, and (3) the present case is based on the same cause of action as the First Delaware Lawsuit, namely, whether Candid's Studio business model and workflow infringes a SDC patent that purportedly covers its SmileShop business model.

47.     Issue preclusion, also known as collateral estoppel, applies because (1) the identical issue of patent ineligibility under 35 U.S.C. § 101 was previously adjudicated in the First Delaware Lawsuit, (2) that issue was actually litigated, with briefing and argument from both sides, (3) the previous determination was necessary to the Court's decision to dismiss the First Delaware Lawsuit, and (4) the party being precluded from relitigating the issue, SDC, was fully represented in the First Delaware Lawsuit.

48.     The '599 patent is a continuation of, and shares the same specification as, the '522 patent that SDC asserted against Candid in the First Delaware Lawsuit.  This Court held that all of the claims of the '522 patent were invalid for claiming the patent-ineligible abstract idea of teleorthodontics: providing dental aligners directly to the patient without the patient ever physically seeing a dentist or orthodontist, and for containing no inventive concept that transforms that abstract idea into patent-eligible subject matter.

49.     Claims 1-25 of the '599 patent are substantially similar to the invalidated claims of the '522 patent, and any difference between the '599 patent claims and the '522 patent claims does not materially alter the question of invalidity under 35 U.S.C. § 101. The '599 patent claims use slightly different language to describe substantially the same alleged invention. SDC has made express representations to this Court that the '599 patent claims are "substantially similar," and "near identical," to those in the '522 patent. Accordingly, the claims of the '599 patent are invalid under 35 U.S.C. § 101 for being directed to a patent-ineligible abstract idea, and SDC is collaterally estopped from arguing the claims of the '599 patent are valid.

50.     A final judgment on the merits was issued in the First Delaware Lawsuit as to virtually identical claims as the '599 patent. The same parties, namely Candid and SDC, are involved in this case and the First Delaware Lawsuit. This suit is based on the same cause of action—*i.e.*, alleged infringement by Candid's same products and/or services and invalidity of claims of the '599 patent that are essentially the same in scope as the '522 patent held to be invalid by this Court.

51.     The identical issue of the validity of the '599 patent was previously adjudicated in the First Delaware Lawsuit vis-à-vis the virtually identical claims of the '522 patent. The issue of the validity of these virtually identical claims was actually litigated, and this Court held those claims invalid as being directed to a patent-ineligible abstract. The previous decision of this Court as to the validity of those virtually identical claims was necessary to, and squarely addressed, by its decision in the First Delaware Lawsuit. SDC was fully represented in the First Delaware Lawsuit.

52.     In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Candid on the one hand, and SDC on

the other, regarding whether SDC is precluded from asserting infringement of any claims of the '599 patent.

53.     Candid therefore seeks a judgment declaring that claim preclusion and issue preclusion bar SDC from asserting infringement of any claims of the '599 patent against Candid.

## ALTERNATIVE CLAIM FOR RELIEF
### (Declaratory Judgment that Candid Does Not Infringe Any Valid Claim of the '599 Patent)

54.     Candid repeats and realleges each and every allegation contained in paragraphs 1-43 as though fully set forth herein.

55.     Candid provides this alternative claim for relief in the event the Court does not find that claim preclusion and/or issue preclusion bar SDC from asserting the '599 patent against Candid.

56.     Claims 1-25 of the '599 patent are invalid under one or more of 35 U.S.C. §§ 101, 102, 103, and 112 and the doctrines of double patenting.  Further, Candid has not infringed any of claims 1-25 of the '599 patent, either directly or indirectly, literally or under the doctrine of equivalents.

### *Invalidity Due to Patent-Ineligible Subject Matter Under 35 U.S.C. § 101*

57.     Claims 1-25 of the '599 patent are invalid under 35 U.S.C. § 101 because they are directed to the patent-ineligible abstract idea of teleorthodontics: providing dental aligners directly to the patient without the patient ever physically seeing a dentist or orthodontist, and for containing no inventive concept that transforms that abstract idea into patent-eligible subject matter.  In particular, the claims of the '599 patent are directed to the abstract workflow of providing clear-aligner treatment to a patient, including: scheduling an appointment for an intraoral scan of a patient's mouth, conducting the intraoral scan, generating a treatment plan for clear

aligner therapy, producing aligners in accordance with the plan, and shipping the aligners directly to the patient without the patient ever having physically seen a dentist or orthodontist.

58.      There is no concrete or tangible form to the claimed invention of the '599 patent.  Instead, the claims of the '599 patent are directed to a standard business practice implemented using routine and conventional technology, such as generic computing systems and off-the-shelf intraoral scanners that SDC concedes it did not invent and were known in the art. The '599 patent specification itself explains that the technology used in the claimed workflow, including the intraoral scanner, was routine and/or well-understood in the art.

59.      Candid is entitled to judgment declaring that claims 1-25 of the '599 patent are invalid under 35 U.S.C. § 101 for being directed to a patent-ineligible abstract idea.

### *Invalidity Due to Double Patenting*

60.      In addition, claims 1-25 of the '599 patent are invalid for double patenting, either statutory double patenting under 35 U.S.C. § 101 or obviousness-type double patenting.

61.      Claims 16-25 of '599 patent claims use slightly different language than claims 1-10 of the '522 patent to describe substantially the same alleged invention.  SDC has made express representations to this Court that the '599 patent claims are "substantially similar," and "near identical," to those in the '522 patent.  The superficial differences between claims 16-25 of the '599 patent and claims 1-10 of the '522 patent are shown in attached Exhibit 5.

62.      Claims 16-25 of the '599 patent are invalid under 35 U.S.C. § 101 for statutory double-patenting and/or obviousness-type double patenting over claims 1-10 of the '522 patent because claims 16-25 of the '599 patent could not be infringed without also infringing claims 1-10 of the '522 patent, and vice versa.

63.     Claims 1-15 of the '599 patent are invalid for obviousness-type double-patenting over claims 1-30 of the '522 patent because claims 1-15 of the '599 patent are at most obvious variants of claims 1-30 of the '522 patent.

64.     Candid therefore seeks a judgment declaring that claims 1-25 of the '599 patent are invalid under 35 U.S.C. § 101 for double-patenting over claims of the '522 patent.

### *Invalidity Under 35 U.S.C. §§ 102 and/or 103*

65.     Each of claims 1-25 of the '599 patent is further invalid under 35 U.S.C. §§ 102 and/or 103.  As a non-limiting example, the claims of the '599 patent are invalid under the prior public use and/or on-sale bars of 35 U.S.C. § 102, and/or rendered obvious over those prior uses, offers for sale, and/or sales in view of the state of the art.

66.     The filing date of the '599 patent is April 27, 2020.  The earliest possible priority date for the '599 patent claims (which Candid does not concede that any of the claims are entitled to) is June 21, 2017.  The earliest possible critical date for the on-sale/prior use bar is June 21, 2016.

67.     SDC has represented that the '522 patent is directed to and claims its SmileShop teledentistry platform.  *See, e.g.*, First Delaware Lawsuit, D.I. 1 at ¶ 4 ("including the … SmileShop® business model that SDC innovated and protected with the '522 patent"), ¶ 28 ("SDC's patented technology, delivered through its SmileShop® locations …"); D.I. 23 at 19 ("The systems and methods Candid infringes are actually practiced by SDC through its SmileShop®. … The SmileShop® (and consequently the systems and methods of the '522 patent) ….."); D.I. 24 (Cicurel Decl.) at ¶ 4 ("The SmileShop® locations offer services and products claimed by the '522 patent."); D.I. 28 (McDuff Decl.) at ¶ 22 ("SDC's SmileShops … practice the patented inventions."); *see also* Exhibit 8 ("SmileDirectClub today announced it has been issued

a patent for its SmileShop intellectual property. … The patent encompasses the unique SmileShop concept and process.").

68.     The '599 patent claims are virtually identical to the '522 patent claims, and consequently also purport to cover SDC's SmileShop concept.  Indeed, SDC issued a press release on December 8, 2020, titled "SmileDirectClub Granted New Patent for SmileShop Retail Concept and Digital Customer Journey," which avers that the '599 patent claims are directed to the SmileShop business concept.  Exhibit 7.  In particular, SDC stated in the press release that "it has secured a second patent from the United States Patent & Trademark Office ("USPTO") for its SmileShop retail concept and digital methodology for the delivery of clear aligner treatment to consumers."  *Id.*

69.     SDC admits that it opened a direct-to-consumer SmileShop retail store in Nashville, Tennessee on May 9, 2016, over one month before the earliest possible on-sale/public use bar critical date.  *See SmileDirectClub, LLC v. Bremer*, No. 3:19-cv-00525, D.I. 42 (Amended Complaint) at ¶ 5 (M.D. Tenn.) ("Tennessee Lawsuit").  Other SmileShops were opened in at least New York and Washington, D.C. prior to June 21, 2016, the earliest possible on-sale/public use bar critical date.

70.     SDC also made averments in the Tennessee Lawsuit concerning "each" of its SmileShops: (1) a patient could visit the SDC website and schedule a free appointment at an SDC SmileShop location; (2) the appointment would be for the patient to have their teeth and gums photographically imaged by a "SmileGuide" using a photographic imaging device, an iTero, which transmits thousands of highly detailed photos turned into a 3D image to a dental lab for the creation of a draft treatment plan to address the patient's chief complaint; (3) the data from the scan are uploaded to SDC's platform; (4) treating doctor reviews, modifies, and approves the draft

treatment plan; (5) the 3D treatment plan is uploaded to the patient's account; (6) the patient may elect to move forward and approve the treatment plan; (7) the treating doctor authorizes a prescription order for clear aligners in accordance with the treatment plan; (8) the aligners are fabricated in accordance with the treatment plan; and (9) the aligners are shipped directly to the patient. *See id.* at ¶¶ 19-20.  The services were provided without the treating professional ever seeing the patient. *See id.* at ¶¶ 18-20.

71.     The opening of the SmileShops in Nashville, Tennessee, New York, and Washington, D.C. (as well as any other SmileShops opened prior to June 21, 2016), in addition to the averments as to the services conducted at "each" SmileShop, establish that the claimed inventions of the '599 patent were in public use, offered for sale, and/or on-sale prior to the critical date, and thus the '599 patent claims are invalid under 35 U.S.C. § 102 or at least obvious under 35 U.S.C. § 103.

72.     SDC claims in the Texas Lawsuit that Candid infringes "at least" claim 16 of the '599 patent.  Publicly available information confirms that SDC was practicing all of the steps of that and other claims of the '599 patent prior to June 21, 2016.

73.     For example, the claim 16 preamble recites: "A method of producing aligners for repositioning one or more teeth of a user, the method comprising."  Prior to June 21, 2016, SDC manufactured clear aligners for repositioning one or more teeth of a user, and provided services for providing those aligners to its patients. *See, e.g.*, Exhibit 11; Exhibit 12; Exhibit 15; Exhibit 18.

# Frequent Questions

## SmileCareClub Invisible Aligners

 **Q**  **What are SmileCareClub invisible aligners?**

SmileCareClub invisible aligners are a series of tight-fitting, custom-made plastic aligners that gradually shift teeth into their desired position.

## Here's How It Works



Privacy & Cookies Policy

1. After purchasing a $95 evaluation kit, the patient submits seven photos to the doctor for evaluation.
2. Once approved by the clinician, SmileCareClub sends the patient an at-home impression kit or schedules an in-home scan.
3. After receiving the SmileCareClub starter trays, the patient confirms the fit and accepts the 3D treatment plan and full cost of treatment.
4. SmileCareClub custom manufactures and ships the aligners directly to the patient.

     74.     The next limitation of claim 16 of the '599 patent recites: "receiving, by an appointment management system, a request to schedule an appointment at an intraoral scanning site, the intraoral scanning site having an intraoral scanner configured to scan a mouth of a user, the appointment being for a technician to conduct an intraoral scan of the mouth of the user at the intraoral scanning site without a dentist or orthodontist physically seeing the user during the scheduled appointment."  Also, the claim recites "scheduling, by the appointment management system, the appointment at the intraoral scanning site based on the request."  Prior to June 21, 2016, a patient could book an appointment for an intraoral scan of his/her mouth and teeth either at the patient's home or office or at a SmileShop.  *See, e.g.*, Exhibit 11 at 2; Exhibit 12 at 4; Exhibit 14; Exhibit 15; Exhibit 21.  SDC advertised that "A SmileTech will meet you at your home or workplace for a quick, 30-minute appointment to capture a 3D image of your smile. … If you're

in a scanning city, ***you'll be taken to a page to book your scan*** after completing your assessment."
Exhibit 15 (emphasis added).

## How is remote-access aligner therapy possible?

Our easy, at-home evaluation process makes it possible for the doctors in our network to evaluate your smile. In select markets, we offer in-home scanning. A SmileTech will meet you at your home or workplace for a quick, 30-minute appointment to capture a 3D image of your smile.

We're adding new markets and new ways to get your scan all the time. You can find out if scanning is available in your area by completing a free smile assessment. If you're in a scanning city, you'll be taken to a page to book your scan after completing your assessment.

We also offer an easy, at-home kit if you're not in a scanning market. You'll complete an online photo assessment and take dental impressions at home. Our lab will use these to create a 3D image of your smile.

Similarly, SDC advertised that patients could book an appointment at a SmileShop for the same scanning services: "Click to book today!" *See, e.g.*, Exhibit 21.



75.   The scan would be conducted by a SmileTech or SmileGuide who was a non-dentist/non-orthodontist technician. *See, e.g.*, Exhibit 13 at 33-34; Exhibit 14. The SmileTech or SmileGuide could be, for example, a dental assistant, dental hygienist, or home health aide. *See id.*

## What is a SmileTech?

SmileTechs come from a variety backgrounds and are trained to efficiently and accurately capture a 3D image of your smile. Many of our SmileTechs are registered dental assistants, dental hygienists or home health aides. We actively monitor and evaluate the quality of their work, including your experience. Our SmileTechs are able to answer any questions you have about our service, our process, our technology and most questions about straightening your smile using invisible aligners.

76.     Claim 16 next recites "generating and causing transmission of, by the appointment management system, a message to a device of the user, the message including a confirmation confirming the scheduled appointment."  Prior to June 21, 2016, on information and belief, a patient would have received a message confirming the scheduled appointment.  As indicated above, a patient could book an appointment, and it is certain the patient would have received an indication that the appointment was booked at the time of booking, and/or an email message confirming the booking of the appointment.

77.     Claim 16 next recites "conducting, using the intraoral scanner, the intraoral scan at the intraoral scanning site during the scheduled appointment, the intraoral scan generating three-dimensional data of the mouth of the user."  Prior to June 21, 2016, the SmileTech or SmileGuide uses an intraoral scanner at the patient's home or office, or at the SmileShop, during the scheduled appointment. *See, e.g.*, Exhibit 13 at 33-34; Exhibit 14; Exhibit 15; Exhibit 22.  The intraoral scanner generates three-dimensional data of the mouth of the user. *See, e.g.*, Exhibit 13 at 33-34; Exhibit 14; Exhibit 15; Exhibit 22.



78.     Claim 16 next recites "causing generation of, by a treatment plan computing system located at a treatment plan site, a treatment plan for the user based on the three-dimensional data."  Prior to June 21, 2016, SDC provided services to generate a treatment plan based on the three-dimensional data of the mouth of the patient.  *See, e.g.*, Exhibit 11 at 1, 2; Exhibit 12 at 4; Exhibit 14; Exhibit 15; Exhibit 17; Exhibit 20 at 2 and *available at* https://www.youtube.com/watch?v=pw1kAWqQv5I.



79.     Claim 16 next recites "receiving an indication of an approval of the treatment plan by a dentist or an orthodontist, wherein the approval is received without the approving dentist or orthodontist having physically seen the user."  Prior to June 21, 2016, a dentist

or orthodontist would approve the treatment and the treatment plan would be sent to the patient for review and approval.  *See, e.g.*, Exhibit 10; Exhibit 11 at 1, 2; Exhibit 12 at 3-5; Exhibit 14; Exhibit 15; Exhibit 17; Exhibit 18 at 2-3.  If the patient approved the plan and chose to proceed with treatment, the dentist or orthodontist would prescribe the treatment plan, and would do so without having physically seen the patient.  *See, e.g.*, Exhibit 10; Exhibit 11 at 1, 2; Exhibit 12 at 3-5; Exhibit 14; Exhibit 15; Exhibit 17; Exhibit 18 at 2-3.

## The remote-access model

The reason you don't go to an actual location is because SmileCareClub operates using a teledentistry model, connecting doctors to patients for remote-access aligner therapy. State-licensed, board-certified dentists and orthodontists in our network review each aspect of a patient's case to determine if remote therapy will work for their needs. If so, the doctor will then work with our orthodontic lab to review and prescribe a treatment plan unique to each patient.

So even though you aren't seeing the doctor in person, you're getting personal, quality care from a doctor licensed in your state.

80.     Claim 16 next recites "producing, at a fabrication site, a plurality of aligners based on the treatment plan, the plurality of aligners specific to the user and being configured to reposition one or more teeth of the user in accordance with the treatment plan."  Prior to June 21, 2016, SDC produced aligners based on the treatment plan.  *See, e.g.*, Exhibit 10; Exhibit 11; Exhibit 12 at 4-5; Exhibit 18 at 1-2.  The custom aligners are configured to reposition one or more teeth of the patient in accordance with the treatment plan.  *See, e.g.*, Exhibit 10; Exhibit 11; Exhibit 12 at 4-5; Exhibit 18 at 1-2.



**CONFIRM FIT WITH YOUR STARTER TRAYS**

Your treatment begins with a custom set of SmileCareClub Starter Trays, which are designed to help you get accustomed to the feeling of wearing aligners. Your starter trays also keep your teeth from moving to make sure the rest of your aligners are the best fit when they arrive.

Once you confirm the fit of your starter trays and accept your treatment plan, our orthodontic lab will create your custom set of invisible aligners, all under the care of your assigned licensed dental provider. Simply wear your aligners day and night, removing them only for meals and when you clean your teeth. Start with the first set and progress to subsequent levels every three weeks. Each new aligner will gradually shift your teeth into the desired position.

While every case is unique to each patient, treatment typically takes 4 to 14 months. The result is a beautiful, new smile. After treatment, we recommend purchasing customized clear retainers, which you'll wear like your aligners for the next six months. After that, just wear the retainers while you sleep to keep your teeth where you want them.



81.     Finally, claim 16 recites "sending the plurality of aligners from the fabrication site directly to the user, wherein the user receives orthodontic treatment without ever having physically seen the approving dentist or orthodontist."  Prior to June 21, 2016, SDC sent the aligners directly to the patient such that the patient received the aligners (and orthodontic treatment) without ever having physically seen the approving dentist or orthodontist. *See, e.g.*, Exhibit 9 at 2; Exhibit 11 at 2.

### Here's How It Works



1. After purchasing a $95 evaluation kit, the patient submits seven photos to the doctor for evaluation.
2. Once approved by the clinician, SmileCareClub sends the patient an at-home impression kit or schedules an in-home scan.
3. After receiving the SmileCareClub starter trays, the patient confirms the fit and accepts the 3D treatment plan and full cost of treatment.
4. SmileCareClub custom manufactures and ships the aligners directly to the patient.

82.     Candid therefore seeks a judgment declaring that claims 1-25 of the '599 patent are invalid under the public use and/or on-sale bars of 35 U.S.C. § 102 and/or rendered

obvious under 35 U.S.C. § 103 over the prior public use and/or sale of the SmileShop services in view of the state of the art.

***Invalidity Under 35 U.S.C. § 112***

83.     Claims 1-25 of the '599 patent are invalid under 35 U.S.C. § 112.  As a non-limiting example, the claims lack written description.

84.     Independent claim 1 includes a negative limitation: "without a dentist or an orthodontist physically seeing the user at the intraoral scanning site."  Independent claims 8, 12, and 16 contain similar negative limitations.  According to SDC, this limitation is what makes it business concept unique and differentiates it from competitors such as Align Technology, Inc., which offers on-site scanning, but requires a visit with a dentist or orthodontist.  *See, e.g.*, First Delaware Lawsuit, D.I. 28 at ¶¶ 14-15.  This limitation also was a key to distinguishing the claims of the '522 patent from a competitor's prior art patent during prosecution.  *See* '522 patent file history, 2019-07-17 Amendment, pp. 2, 5, 6, 10, and 14.  Despite the supposed importance of this limitation, the specification of the '599 patent does not disclose that the user does not physically see a dentist or orthodontist during the scanning appointment, much less disclose any reason for excluding having the user physically see a dentist or orthodontist during the scanning appointment.

85.     For at least this reason, each claim of the '599 patent is invalid under 35 U.S.C. § 112.

***Noninfringement***

86.     Candid does not infringe any valid claim of the '599 patent, either directly or indirectly, literally or under the doctrine of equivalents.  At the very least, because each of claims 1-25 is invalid, they cannot be infringed.

87.     Candid also does not infringe the claims of the '599 patent for additional reasons.  As a non-limiting example, Candid does not infringe claims 1-15 because it does not implement systems or methods for:

> generating and causing transmission of, by the appointment management system, a message to a device of the user, the message causing a reminder to be presented to the user to remind the user to leave for the scheduled appointment, wherein the reminder is presented to the user a threshold time prior to the scheduled appointment, wherein the threshold time is determined based on a location of the user with respect to a location of the intraoral scanning site, and further based on at least one of traffic between the location of the user and the location of the intraoral scanning site, weather, a time of day of the appointment, or a day of the week of the appointment

as recited in independent claim 1 or the analogous limitations of independent claims 8 and 12.

88.     In view of the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between Candid on the one hand, and SDC on the other, regarding whether Candid infringes any valid claim of the '599 patent.

89.     Candid therefore seeks a judgment declaring that it does not infringe any valid claim of the '599 patent.

## **PRAYER FOR RELIEF**

Candid respectfully requests the following relief:

A.     That the Court enter judgment declaring that claim preclusion and/or issue preclusion bar SDC from asserting that Candid infringes any claims of the '599 patent;

B.     That, in the alternative to the relief requested in A, the Court enter judgment declaring that the claims of the '599 patent are invalid under one or more of 35 U.S.C. §§ 101, 102, 103, and 112 or the doctrines of double patenting;

C.      That, in the alternative to the relief requested in A, the Court enter judgment declaring that Candid has not infringed and does not infringe any valid claim of the '599 patent, either directly or indirectly, literally or under the doctrine of equivalents;

D.      That the Court declare that this case is exceptional under 35 U.S.C. § 285 and award Candid its attorneys' fees, costs, and expenses incurred in this action and the related Texas Lawsuit;

E.      That the Court award Candid any and all other relief to which Candid may show itself to be entitled; and

F.      That the Court award Candid any other relief as the Court may deem just, equitable, and proper.

## JURY DEMAND

Candid hereby demands a jury trial on all issues and claims so triable.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

OF COUNSEL:

Michael P. Sandonato
Sean M. McCarthy
Joshua D. Calabro
VENABLE LLP
Rockefeller Center
1270 6th Avenue
New York, NY  10020
(212) 307-5500

Edmund J. Haughey
VENABLE LLP
600 Massachusetts Avenue, N.W.
Washington, DC  20001
(202) 344-4000

December 23, 2020

Rodger D. Smith II (#3778)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@mnat.com
cclark@mnat.com

*Attorneys for Plaintiff Candid Care Co.*